# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2003-CA-02640-SCT

*CITY OF GREENVILLE, MISSISSIPPI*

*v.*

*JOHN H. JONES AND MONICA JONES*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/13/2003 |
| TRIAL JUDGE: | HON. BETTY W. SANDERS |
| COURT FROM WHICH APPEALED: | WASHINGTON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | TIMOTHY DALE CRAWLEY |
| | VATERRIA LASHAUNDA McQUITTER |
| ATTORNEYS FOR APPELLEES: | WILLIE L. BAILEY |
| | WILLIE GRIFFIN |
| NATURE OF THE CASE: | CIVIL - TORTS-OTHER THAN PERSONAL INJURY & PROPERTY DAMAGE |
| DISPOSITION: | REVERSED AND RENDERED - 03/30/2006 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.     In this Mississippi Tort Claims Act case, the City of Greenville appeals from the circuit court's final judgment entered for the plaintiffs subsequent to a bench trial. Finding error by the Circuit Court of Washington County, we reverse and render judgment here in favor of the City of Greenville.

**FACTS AND PROCEEDINGS IN THE CIRCUIT COURT**

¶2.     On August 15-16, 1999, four bomb threat calls were placed to the E-911 dispatcher at the Greenville Police Department (GPD). On August 15, an unidentified caller stated, in two separate calls, that a bomb had been placed in the GPD. On August 16, an unidentified caller stated, in two separate calls, that a bomb had been placed in Greenville's T. L. Weston High School. While law enforcement officials were concerned about the safety of the personnel and citizens occupying the GPD building, their greater concern was understandably focused on the high school due to the potential serious harm to the children. After the calls of August 16, police officers and fire department personnel and vehicles were immediately dispatched to Greenville-Weston High School, which was evacuated.

¶3.     The GPD utilized the CADS system which had the capability of tracing these 911 calls. A check of the CADS system revealed that all four threatening phone calls had been made from a cellular telephone serviced by Cellular South, a division of Telepak, Inc. After receiving a circuit court order directing Telepak to release certain phone records for the relevant dates and times, the GPD in due course received a packet from Telepak which purportedly contained the name of the person owning the cellular phone from which the threatening calls had been placed. Five pages of this six-page packet were generated from a search conducted by a Telepak employee. This search revealed that all four of the bomb threat calls had been placed from a cellular phone bearing a particular phone number. Unfortunately, when this same Telepak employee entered the phone number information into

the Telepak system in order to determine the name of the owner of the cellular phone bearing this phone number, he transposed two of the numbers and thus inadvertently entered into the system the wrong phone number. When this incorrect information was entered into the system, the resulting data revealed that the cellular phone bearing the transposed phone number belonged to John H. Jones. Thus, page two of the packet revealed that Jones owned the cellular phone bearing the transposed phone number; however, pages 3-6 of the packet revealed that the four bomb threat calls had been placed from the cellular phone bearing the untransposed phone number.[1]

¶4.     Upon receiving the Telepak packet the GPD officials, based on the information contained on the second page regarding John H. Jones, sought and received a county court order directing that a warrant be issued for Jones's arrest. Jones was then arrested and subsequently indicted for the felony offenses of falsely reporting that explosives had been placed in the GPD and T. L. Weston High School. Jones's public defender, Marie Wilson (who has since become a Chancery Judge for the Ninth Chancery Court District for the State of Mississippi), in reviewing the discovery materials produced in the criminal case, discovered the transposed cell phone numbers. After Wilson brought this information to the attention of the District Attorney, the circuit judge, at the request of the State of Mississippi,

---

[1] In order to protect Jones's privacy and security, instead of revealing his cellular phone number, we will refer to Jones's cellular phone number as the "transposed" phone number and the cellular phone number from which the bomb threat calls were placed as the "untransposed" phone number.

entered an order of nolle prosequi, thus ending the criminal prosecution of Jones on these charges.

¶5.    Approximately ten days after his criminal charges were nolle prossed, Jones and his wife, Monica, commenced civil litigation against Telepak, doing business as Cellular South, as well as Telepak employees who were named as "John Doe" defendants. This suit sought compensatory and punitive damages for Jones and damages for Mrs. Jones on a loss of consortium claim. The complaint was later amended to add the City of Greenville as a defendant, thereby asserting a claim for damages against the City pursuant to the Mississippi Tort Claims Act (MTCA). *See* Miss. Code Ann. §§ 11-46-1, et seq. (Rev. 2002). The Joneses eventually settled with Telepak, which was dismissed with prejudice by way of a circuit court order, and a second amended complaint was filed against the City of Greenville.

¶6.    In due course, a bench trial was conducted before the Circuit Court of Washington County, Judge Betty W. Sanders, presiding. At the conclusion of the presentation of the evidence, Judge Sanders took this matter under advisement, and subsequently entered a final judgment finding "that the GPD acted in reckless disregard as to John Jones." The final judgment also provided for an award of damages in the amount of $95,000 to John Jones, and $500 to Monica Jones. It is from this final judgment that the City of Greenville now appeals.

**DISCUSSION**

¶7.    The City assigns only two errors for us to consider in today's appeal. We reorder and restate the City's issues as follows: (1) Whether the circuit court erred in finding the GPD

4

acted in reckless disregard of Jones's safety and well-being; and, (2) whether the circuit court erred in failing to apportion fault to the settling defendant, Telepak, pursuant to Miss. Code Ann. § 85-5-7. Finding the first issue to be dispositive of this case, we address only this issue.

I. **WHETHER THE CIRCUIT COURT ERRED IN FINDING OFFICERS OF THE CITY OF GREENVILLE POLICE DEPARTMENT ACTED IN RECKLESS DISREGARD OF THE SAFETY AND WELL-BEING OF JOHN H. JONES.**

¶8. Whenever this Court considers on appeal a trial judge's findings of fact, we appropriately afford deferential treatment. Even though we quite often review circuit court cases based upon judgments entered after a jury trial, whenever we are called upon to consider the findings of fact of a circuit judge sitting without a jury, that circuit judge is entitled to the same deference concerning his/her findings of fact as is afforded to a chancellor, who almost always sits, without a jury. *City of Jackson v. Perry*, 764 So.2d 373, 376 (Miss. 2000) (citing *Puckett v. Stuckey*, 633 So.2d 978, 982 (Miss. 1993)).

¶9. To say that John Jones and his family had to endure an extremely traumatic experience because of the criminal charges brought against Jones is a gross understatement. Wilson's trial testimony describes her first encounter with Mr. and Mrs. Jones after being appointed to represent Mr. Jones on the criminal charges:

> He came with his wife. And – and I was impressed by them because they were such a young couple. And I think during the interview, it came out that they had very young children. They seemed like a nice, sweet young couple, and

5

they were so upset. She was crying. He was crying. It was just a mess, you know, quite frankly.

Jones testified at trial that he and his wife had two young children, an eight-year old daughter and a fifteen-year old son. One can only imagine how a father explains to his children that he has been arrested, jailed and charged with criminal activity.

¶10. Thus, that the Joneses are entitled to monetary damages for what has happened to them should hardly be cause for debate. However, as with any civil tort suit for money damages, before considering the issue of damages, the first hurdle a plaintiff must successfully overcome with the trier-of-fact is proof of liability – duty, breach of duty, and proximate causation. In this MTCA case, the plaintiffs have an additional hurdle. The Legislature of this State has expressly declared its intent that as a matter of public policy, the state and its political subdivisions, inter alia, are immune from suit due to any "tortious act or omission" by any employee of the state or its political subdivisions even though such act or omission "may be considered as the exercise or failure to exercise any duty, obligation or function of a governmental, proprietary, discretionary or ministerial nature." Miss. Code Ann. § 11-46-3(1). However, there are exceptions. The MTCA provides, inter alia:

> (1) A governmental entity and its employees acting within the course and scope of their employment or duties shall not be liable for any claim:
> ************
> > (c) Arising out of any act or omission of an employee of a governmental entity engaged in the performance or execution of duties or activities relating to police or fire protection unless the employee acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of injury.

6

Miss. Code Ann. § 11-46-9(1)(c). Thus in today's case, notwithstanding any damages suffered by John and Monica Jones, before they can recover damages against the City of Greenville, they must prove the Greenville police officers in question, while engaged in the performance of their duties relating to police protection, "acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of the injury." *Id*.

¶11.	Our cases are by now legion where we have defined the phrase "reckless disregard" as it relates to MTCA cases. We have previously stated:

> In order to recover under the MTCA, a plaintiff must prove that the officer "acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of the injury." Miss. Code Ann. § 11-46-9(1)(c); *see City of Ellisville v. Richardson*, 913 So.2d 973, 977-79 (Miss. 2005). "Reckless disregard" has been described by this Court as "a higher standard than gross negligence and `embraces willful or wanton conduct which requires knowingly and intentionally doing a thing or wrongful act.'" *Collins v. Tallahatchie County*, 876 So.2d 284, 287 (Miss. 2004) (quoting *Turner v. City of Ruleville*, 735 So.2d 226, 230 (Miss. 1999)).

*City of Jackson v. Powell*, 917 So.2d 59, 71 (Miss. 2005). There is no dispute that at all relevant times, the Greenville police officers were lawfully engaged in the performance of their duties relating to police protection and that John Jones was not engaged in criminal activity at the time this cause of action accrued. This case obviously turns on whether the actions and/or inactions of the Greenville police officers rose beyond the level of mere negligence to that of reckless disregard for the safety and well-being of John Jones so as to remove the City from the statutory exemption from liability which it otherwise enjoys. To

7

make this determination, we must address the facts of this case in much more detail than the brief factual summary we have thus far provided.

¶12. Jones asserts, inter alia: (1) a careful review by the GPD officers of the Telepak packet would have revealed that the cell phone number from which the bomb threat calls were made was different from Jones's cell phone number; (2) Jones and his father-in-law, Reverend G. A. Johnson, continually protested to the GPD that an innocent man had been arrested for these crimes, and the GPD refused to investigate Jones's claims of innocence; (3) the inaccurate information in the Telepak packet was the sole basis for Jones's arrest; and, (4) the grossly inadequate GPD investigation resulted in Jones being maliciously prosecuted for felony charges which were later dismissed.

¶13. In a very detailed and thorough 15-page Findings of Fact and Conclusions of Law, the trial judge devoted only five paragraphs (approximately one page) to the "reckless disregard" issue.[2] For the sake of emphasis, we set out the trial judge's entire discussion on this issue:

> Before the plaintiffs can recover under the Mississippi Tort Claims Act, Miss. Code Ann. § 11-46-9(1)(c), they must prove the GPD [Greenville Police Department] acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of the injury. "In the context of the statute, reckless must connote "wanton or willful", because

---

[2]The trial judge addressed four issues: (1) whether the GPD had probable cause for the issuance of an arrest warrant for Jones; (2) whether the GPD officers acted in reckless disregard of Jones's safety and well-being; (3) whether the plaintiffs sustained a cause of action for false arrest, false imprisonment and malicious prosecution; and, (4) whether the plaintiffs suffered injuries and damages which were recoverable from the City pursuant to the MTCA.

immunity lies for negligence." *Turner v. Ruleville*, 735 So.2d 226, 229 (Miss. 1999).

The GPD had inconsistent information in its possession for approximately five days prior to applying for the arrest warrant. They failed to investigate prior to executing an affidavit and presenting this affidavit to County Court Judge Vernita Johnson, who executed the arrest warrant. The Court notes the County Court Judge was not presented the entire document from Cellular South.

On August 25, 1999, in addition to the denials and inconsistencies discussed previously,[3] defendants admitted their investigation was inadequate. Under these circumstances, it can be concluded that Sgt. Franks did not objectively have a reasonable belief of who committed the crime prior to the filing of the affidavit for Jones' arrest.

The GPD failed to adequately investigate this case before obtaining an arrest warrant. They failed, at a minimum, to interview Jones to determine his whereabouts on the day and time of the 911 calls, to determine who had access to his phone on the day and time in question, to determine whether his cell phone had been stolen and whether his phone was operational on the day and time in question.[4]

This Court finds ample evidence that the GPD acted in reckless disregard for Jones (sic) safety and well-being by failing to investigate before obtaining the search warrant.

¶14. Major Stacy Hollis, the assistant police chief for the City of Greenville, was the chief of the detective division, and he thus headed up the investigation in the bomb threats case. Major Hollis instructed Lt. Danny Suber, also a member of the detective division: (1) to retrieve copies of the 911 tapes; (2) to direct Detective Daniel Frank to interview the 911

---

[3]Indeed, the trial judge had made detailed findings-of-fact which consumed thirty-five paragraphs and eight pages of the 15-page opinion.

[4]As will be hereinafter discussed, the issue of whether Jones's cell phone was "operational on the day and time in question," is of no moment.

dispatchers as to any description or voice identification of the bomb-threat caller, any background noises, or other information to aid in the identification of the caller; and, (3) to attempt to get a court order to retrieve the cellular phone records. Upon receiving a court order from Circuit Judge Ashley Hines, Lt. Suber retrieved the phone records in order to determine the identity of the Cellular South customer who owned the cell phone from which the 911 calls had been made on August 15, 1999, and August 16, 1999, during the relevant times.

¶15. James A. Torrey, Jr., Judy Whitehead, Rob Mason, and Rebecca Posecai are all employees of Telepak, Inc., which does business under the name Cellular South. Torrey, a Meadville attorney, is general counsel for Telepak; Whitehead is the secretary for the CEO of Telepak; Mason is in Telepak's Information Technology Department; and, Posecai is Telepak's Greenville store manager. Torrey received a telephone call from Pam Miller, an investigator with the District Attorney's office in Greenville, concerning the retrieval of certain cellular phone records to investigate the bomb threats. Torrey informed Miller that a subpoena would be necessary. Upon receiving the court-ordered subpoena duces tecum, Torrey contacted Whitehead, who in turn e-mailed Mason as to the requested information. Mason was instructed to retrieve the necessary information concerning the Cellular South customer whose phone was used to place the bomb threat calls to Greenville's 911 on the dates and during the time frames in question. Mason testified via a sworn affidavit, inter alia:

> After I located the four calls to 911, I entered the number in the billing system
> to identify the name and address of the customer. However, when I entered

10

the numbers into the system, I mistakenly transposed the numerals six and nine. The retrieved data revealed that John Jones was the owner of the cellular telephone with the [transposed] number.... I did not realize the mistake had been made until after this civil suit was filed.

I delivered the raw computer data identifying ... the telephone number from which the four outgoing calls to 911 were made, and a Screen Print of the [transposed] mobile number ... which showed John Jones was the owner of the [transposed] ... to Judy Whitehead.

¶16. Upon receiving this information from Mason, Whitehead transmitted to Torrey the raw computer data showing four outgoing calls to 911 from the untransposed cell phone number, and a Screen Print of the transposed cell phone number indicating John Jones to be the owner of the cellular phone with the transposed number. Torrey then transmitted this information to Posecai in Greenville with instructions to deliver this information directly to Lt. Suber. As instructed, Posecai telephoned Lt. Suber who drove to the Greenville Cellular South store and retrieved this information from Posecai.

¶17. This packet of information, which was introduced into evidence at trial (twice) as Exhibit No. P-8 and Exhibit No. D-15, consists of six pages. The first page is a telecopier cover letter from Torrey to Posecai. The second page contains information as follows:[5]

   1. MOBILE NO....................................................[transposed no.]
   2. ACTIVATION DATE.......................................05/12/1999
   3. FIRST NAME..................................................JOHN
   4. LAST NAME...................................................JONES

---

[5]A review of the Telepak packet reveals that the font is actually much smaller than depicted here. Also, for the sake of Jones's privacy, certain personal information contained in this packet is not revealed here. The deleted information is not relevant to today's discussion.

    5.  HOME PHONE....................................................XXXXXXXXX
    6.  ADDRESS...........................................................XXXXXXXXX
    7.  CITY....................................................................GREENVILLE
    8.  STATE.................................................................MS
    9.  ZIP CODE............................................................38701
    10.  SOCIAL SECURITY NUMBER......................XXXXXXXXX
    11.  SALESMAN NUMBER.................................58
    12.  ESN......................................................XXXXXXXXXX
    13.  STATUS.................................................P
    14.  SERIAL/RECEIPT NUMBER........................XXXXXX
    15.  INITIAL PAYMENT LESS SERVICE CONNECT/TA.. 50.00
    16.  LOCATION..............................................D1
    17.  DEACTIVATE DATE.........................................

The third, fourth, fifth and sixth pages contain the following information at the top of each

page:

    RECCODE: F7               CLNGNMB: [untransposed no.]   CALLTYP: 1

Here is but an example of what appears on unnumbered lines/columns  2-23 on pages 3, 4,

5, and 6 of this packet received from Telepak/Cellular South:

    ENTCODE:                   CREDITC:

    OFEATCD:00000000    DIALDEM:911         ACCNTCD:
    TFEATCD:00000000    CALLEDN:911         FILLER6:
                        CLLDSER:            FILLER7:
    CLNGSYS:01382       BILLNUM:            TREATCD:000
    ORGIMSA:002         AUTHCOD:            FILLER8:

And this goes on for another sixteen lines/columns.  Lt. Suber testified about pages 3, 4, 5,

and 6 of this document at trial:

    Q.  Do you have any idea what all those acronyms, abbreviations are?
    A.  No, sir.  I do not.
    Q.  So you can't tell anything from page two – excuse me, page three as to an
    individual, can you?

12

A. No, sir, I cannot.

Q. The same thing is true of page four?

A. That's correct, sir.

Q. Same thing true of page five?

A. Yes, sir.

Q. Same thing true of page six?

A. That's correct, sir.

Q. So on pages three, four, five, and six, all of this information is what I call computer language?

A. That's correct, sir.

Q. And you have to be computer literate to understand it, don't you?

A. Yes, sir.

Q. From your review of D-15 you concluded in your report that these records, D-15, indicate calls to 911 came from mobile [transposed no.]...?

A. That's correct, sir.

Q. And this identifies John Jones?

A. That's correct, sir.

In fact, while testifying at trial, Lt. Suber, who admitted he was not completely familiar with this packet, thumbed through the six pages and stated that the transposed number appeared on page two, and that the same phone number appeared on pages three, four, five and six. He later had to be corrected as to the fact that it was the untransposed number [and not the transposed no.] which appeared on pages 3, 4, 5, and 6 of the Telepak packet.

¶18. Upon receiving this packet from Posecai, Lt. Suber placed this information in Investigator Frank's case file. Lt. Suber also logged the 911 tapes on the evidence log sheet and placed the tapes in the police department's case file. A portion of Investigator Frank's deposition was read into the record at trial, and this evidence revealed that Investigator Frank stated that Lt. Suber informed him that the phone records obtained from Cellular South

13

revealed John Jones to be the owner of the cell phone from which the 911 bomb threat calls had been placed.

¶19. At trial, Jones no doubt focused on Major Hollis in his effort to convince the trial judge that the City was not exempt from liability under the MTCA due to the police officers' reckless disregard for the safety and well-being of Jones. Both Jones, and Rev. G. A. Johnson, Monica Jones's stepfather, testified that Major Hollis told them (on separate occasions) that he (Hollis) knew that Jones did not commit the crimes but that he (Hollis) believed that Jones knew who committed the crimes and Jones would be held in custody until he revealed the name of the guilty person. Both Rev. Johnson and Jones also testified that Hollis stated to them (again separately) that he (Hollis) did not believe the voice on the 911 tapes was that of Jones. However, at trial, Major Hollis vehemently denied these allegations:

> Q. But I take it you never told Rev. Johnson that you had listened to the tapes again, or a second time, and from listening to the tapes a second time, you had determined that the voice was not that of John Jones.
> A. No, sir.
> Q. Did you ever tell Rev. Johnson in either one of your meetings with him that the only reason you were holding John Jones was to get him to identify the other parties involved in the bomb threat calls?
> A. No, sir, I did not.

On several occasions during his testimony, Major Hollis attempted to explain about the 911 tapes. On direct examination, Major Hollis testified:

> Q. Did you ever tell Rev. Johnson in either of the meetings with him that you had listened to the tapes?
> A. Yes.
> Q. And did you tell him on either occasion, any occasion, that you had determined that it was not John Jones's voice on the tapes?

14

A. I hadn't talked to Mr. Jones enough to be able to make that determination. I did state to him that I did listen to the tapes, and it was a black male in my opinion and the opinion of the dispatchers. But I'd only – I think the only words he had stated to me was that I was a liar.

Q. You're talking about Mr. Jones?

A. Mr. Jones, that's correct, and I don't – that really wasn't enough conversation for me to say whether it was or wasn't him.[6]

Admittedly, Major Hollis, in response to a question early on during the cross-examination by Jones's lawyer immediately after the 911 tapes were played during the trial, testified:

Q. And is it your opinion that the voice on that tape is John Jones, our plaintiff in this case; is that right?

A. No, sir.[7]

Q. Was any determination ever made that this voice on this tape was John Jones?

A. No, sir.

However, later during the cross-examination of Hollis, the following exchange occurred:

Q. And your decision to apply for the search warrant was based solely on what Suber told you?

---

[6]Major Hollis admitted that he attempted to engage Jones in conversation when Jones was arrested and brought to the police station, and this was for the purpose of listening to Jones's voice long enough during the conversation to determine if the voice on the 911 tapes was that of Jones. As Hollis testified at trial: "[T]here's not anything wrong with lying to someone that you've got charged with a crime. It is not against the law to lie. It's not against the law to say things to try to make them talk to you. To try to tell them, yes, I've got more evidence on you than I really do. That's the way a lot of investigations are done." Hollis was not trying to get Jones to confess to something he did not do – he was trying to engage Jones in conversation long enough to determine in his mind if Jones's voice was the voice he had heard on the 911 tapes.

[7]This was the conclusion reached by Major Hollis by the time of trial, and after again listening to the 911 tapes during his testimony at the trial. As will be seen, however, this trial conclusion by Major Hollis was reached with the benefit of hindsight, because the record reveals that during the investigation, Major Hollis firmly believed that Jones's voice was on the 911 tapes and that Jones was the guilty party.

15

A.  I didn't apply for the search warrant, first of all.  They told me what information they had involving the case.  I felt that there was probable cause based on the information they told me.  I told them to, in turn, apply for the search warrant based on what they told me, and also the warrant for the phone records, and to my knowledge, that's what they did. They come back and said, yes, they had applied for the phone records.  The judge had reviewed it, and signed it, and we applied for the records.

Q.  And did you review anything else before you told them to get a search warrant – to get an arrest warrant?

A.  I had listened to the tape. I had talked to the two dispatchers.  I had looked over their statements.......What I was saying, Mr. Bailey, is I had looked at the two dispatchers' statements.  I had listened to the tape twice.  I had seen Mr. Jones, but he wouldn't talk to me basically.  I would have liked to. And then we had the phone records.  Based on those things, that's what I had to go on.

As Hollis later explained during cross-examination, investigative work is basically "having to put the pieces together like a puzzle."  Also, later, during cross-examination, Hollis further tried to explain police work in the real world:

> If this was the only case that we had to work, but that would be an ideal world, but we – I may have assigned them [other officers] four or five cases a day.  They would work one case to the point that they couldn't really get no further at that point, and then they would go to the next case and work up until they could get to a stopping point on it.  They didn't just have this one case they were working.  I know on TV that's the way they portray it.  They run out there and they grab one case, but it's just not like that.
> ************
> If I could go and investigate every case, Mr. Bailey, and look at every piece of paper that comes through that police department, I would love to.  But you and me both know it don't happen that way.  In a perfect world, yes sir.
> ************
> Q.  You were not careful in your investigation, were you?
> A.  Oh, I think the investigation was very careful.  I wouldn't go as far as saying it was careless. I just think there's things that you could do better, and some things were out of our control.  I mean, I don't have the manpower to dedicate to cases 24 hours a day, but it really wouldn't have made any difference on this one because we got to a point that you can't just keep going.  It was a dead end.

16

¶20. The trial judge in this case patiently considered extensive evidence offered over the course of three days in this bench trial. The record reveals that during recesses, she would "squeeze in" other court business unrelated to this matter, simply trying to keep a handle on what was most assuredly a crowded docket. At the conclusion of the presentation of the evidence on the third day, the trial judge took this matter under advisement and then made a fairly common request:

> BY THE COURT: All right, Attorneys, it's been a pretty lengthy trial, and what I want to do in order to go ahead and rule promptly – you, by now, having been together three days, you know what my schedule is tomorrow and next week. I would like – and you tell me how much time you need, each party, to do proposed findings and recommendations. I would like to have it Monday, proposed findings of fact and conclusions of law and –
> \*\*\*\*\*\*\*\*\*\*\*\*
> BY THE COURT: So I'd like to go ahead. Another reason I'd like to go ahead because the delay in receiving the proposed findings, as each of you can understand, is more difficult to remember. I know that they won't be the same.
> \*\*\*\*\*\*\*\*\*\*\*\*
> BY THE COURT: Yes, sir. What I want is a printout, and I want it on a disk, and you know, send the disk so I can make my own changes.
> \*\*\*\*\*\*\*\*\*\*\*\*
> BY THE COURT: Both the hard copy and give me the disk, and that way I can speed along. You know, you've already got – each side already has it typed so I can speed along in getting the order back because we're back over here next week.

¶21. It is hardly uncommon and certainly altogether appropriate for our overworked and understaffed trial judges to make a request similar to the one made by the trial judge in this case – request that each party's attorney send a proposed findings of fact and conclusions of law (FOFCOL) to facilitate the trial judge's ultimate entry of an opinion and order/judgment. Certainly, with today's computer technology, disks can also be sent (as was requested by the

17

trial judge in this case). Upon receipt of these disks with the proposed FOFCOL, a trial judge and the judge's law clerk/staff attorney can then "cut and paste" into an opinion which is indeed the original work product of the trial judge, albeit containing perhaps verbatim portions of the proposed FOFCOL submitted by the respective attorneys. The only caveat we have issued to our trial judges when utilizing this method of generating an opinion is that if it appears to this Court on appeal that a trial judge has adopted verbatim the proposed FOFCOL submitted by one of the parties, by and through counsel, we will stray from our deferential treatment of a trial judge's findings of fact and instead apply a heightened scrutiny or de novo review. *City of Belmont v. Miss. State Tax Comm'n*, 860 So.2d 289, 293-95 (Miss. 2003).[8] This having been said, we unhesitatingly conclude that there is no reason to apply any other standard of review of the trial judge's FOFCOL in this case than that of deferential treatment.

¶22. Notwithstanding our deferential treatment of the trial judge's findings of fact in today's case, our concern here is that there is at least one major erroneous finding of fact by the trial judge. We know not whether this finding of fact was included in the proposed findings of fact submitted to the trial judge by Jones's counsel, and then adopted by the trial judge, or whether this finding of fact originated with the trial judge. Regardless, we find these statements in the trial judge's 15-page Findings of Fact and Conclusions of Law:

---

[8]*See also* **City of Belmont**, 860 So.2d at 293 n.6.

18

Moreover, Asst. Chief Hollis admitted he did not believe Jones committed the crime or was the voice on the telephone. Equipped with this information, defendant failed to establish prong 2: reasonable cause to believe that Jones is the person who placed the telephone calls.[9]

************

Hollis admitted he knew Jones did not place the E/911 calls but believed Jones knew who did.[10]

¶23. In discussing the "probable cause to arrest" issue, the trial court stated:

The evidence further established that Jones, even prior to his arrest declared his cellular phone inoperable, alerted the booking clerk that the social security number and telephone number of the John Jones in the police record did not belong to him, his birth place was Charleston, MS not Chicago, IL, he was in Los Angeles, CA in 1993, not in Greenville, MS when the information in the record was complied [sic] and reiterated he had no prior arrest record. Moreover, Asst. Chief Hollis admitted he did not believe Jones committed the crime or was the voice on the telephone. Equipped with this information, defendant failed to establish prong 2: reasonable cause to believe that Jones is the person who placed the telephone calls. No other evidence supported John Jones ... [transposed] cellular telephone number ... as being the prankster.

We thus emphasize that the trial court made an erroneous finding of fact from the clear evidence in the record. Asst. Chief Hollis *never* admitted *that during the investigation*, he did not believe that Jones committed the crime or that Jones's voice was not on the 911 tapes.

---

[9]These statements relate to the trial judge's discussion of whether the Greenville Police Department had probable cause to seek the issuance of an arrest warrant for Jones. Additionally, assuming arguendo that the trial judge made this finding of fact regarding Hollis's "admissions" based on the testimony of Rev. Johnson and/or Jones (which appears to be the only evidence in the record from which she could make such a finding), this finding is clearly erroneous since, according, to Rev. Johnson and Jones, these statements were made by Hollis *after* Jones had been arrested. Thus, the trial judge clearly erroneously used this Johnson/Jones testimony as a basis in determining lack of probable cause to seek the issuance of the arrest warrant.

[10]These statements relate to the trial judge's discussion of whether the Greenville Police Department was guilty of malicious prosecution.

He only admitted *at trial*, in the cool light of after-developed facts, and with the benefit of 20-20 hindsight, that he had by the time of the trial come to the realistic conclusion that Jones had not committed the crime. To his credit, Major Hollis, at trial, readily admitted that fact because by the time of the trial, Hollis knew that Mason had transposed the numbers on the Telepak packet submitted to the Greenville Police Department and that Jones's criminal case had been nolle prossed. However, contrary to the finding of the trial judge, Major Hollis *never* admitted that *during the course of the investigation*, he knew or believed that Jones had not committed the crime and that Jones's voice was not on the 911 tapes, and yet, he still allowed Jones to be arrested, indicted and prosecuted.

¶24. On the other hand, it is true that both Rev. Johnson and John Jones testified that Hollis, in separate conversations, informed them that he (Hollis) did not believe that Jones committed the crimes, but he was holding Jones until he revealed the identity of the real culprit, and that he (Hollis) did not believe the voice on the tape was that of Jones;[11] however, at trial, Hollis vehemently denied that he ever made those statements to Rev.

_____

[11]Even assuming, arguendo, that the trial judge correctly concluded from the disputed testimony that Hollis told Rev. Johnson and Jones, after Jones's arrest, that he (Hollis) did not believe that Jones committed the crimes or that the voice on the 911 tapes was that of Jones; and, even assuming, arguendo, that Hollis did indeed make these statements, this evidence would not support a finding of reckless disregard on the part of Hollis, or any other officer of the Greenville Police Department. Such evidence could appropriately be deemed to be exculpatory evidence which, upon indictment, and invoking of our discovery rules, law enforcement officials, via the District Attorney's office, would have been required to reveal. *See* URCCC 9.04 A.6. Thus, we can conclude here that Hollis did more than required of him. He revealed, pre-indictment, and without a formal invocation of our discovery rules, this "exculpatory information" to, not only Jones, but also to Rev. Johnson.

Johnson or John Jones. This clearly created a disputed fact issue to be resolved by the trier-of-fact. *See **Culbreath v. Johnson**,* 427 So.2d 705, 708 (Miss. 1983). However, the trial judge did not find from this disputed evidence that Major Hollis made these statements to Rev. Johnson or Jones – the trial judge instead found as a matter of proven fact that Major Hollis "*admitted he did not believe Jones committed the crime or was the voice on the telephone.*" (Emphasis added). It is important, indeed critical, to emphasize here *that the trial judge made this finding in the context of discussing whether there existed at the time of the issuance of the arrest warrant probable cause to believe that Jones had committed the crimes of making the 911 bomb threat calls*. Again, assuming arguendo that the trial judge used the testimony of Rev. Johnson and/or John Jones as the basis for determining that Hollis "admitted" that he did not believe Jones committed the crimes or that it was Jones's voice on the 911 tapes, these statements which were allegedly made by Hollis to Rev. Johnson and/or Jones, would have been made *after* Jones's arrest, and thus could not properly be used by the trial judge in finding lack of reasonable cause to believe that Jones was the person who placed the 911 calls, thus failing to establish probable cause for the issuance of the arrest warrant. By the time these statements were allegedly made by Hollis to Jones and/or Rev. Johnson, Jones had already been arrested. Because the totality of the record reveals that this critical finding of fact is clearly erroneous and manifestly wrong, we are not required to afford deferential review, and thus the reckless disregard issue fades to no more than a negligence case against the City of Greenville.

21

¶25. A review of the record in its totality, causes us to conclude that, notwithstanding Jones's efforts at trial to convince the trial judge of the existence of an alleged vendetta by Hollis against Jones in attempting to force Jones to reveal the identity of the real culprit by keeping Jones in custody despite Hollis's belief that Jones did not commit the crime, Jones's primary focus during the trial was on the failure of Hollis and the other police officers to realize that, even though Jones's name and cell phone number appeared on page 2 of the Cellular South packet, a different cell phone number appeared on pages 3, 4, 5, and 6 of the packet. We now know the reason for this mistake was a Telepak employee's transposing of the numbers.

¶26. In her FOFCOL, the trial judge made several references to either an inadequate investigation, or a failure to perform certain acts during the course of the investigation. This is negligence, not reckless disregard. *City of Jackson v. Powell*, 917 So.2d at 71. Indeed inadequacy and carelessness was the focus of the plaintiffs' case. For example, Jones's attorney asked Major Hollis on cross-examination, "You were not careful in your investigation, were you?" Jones also focuses on the fact that he repeatedly told the police officers that his cell phone was inoperative and that he "did not do it." First of all, the record is replete with proof that a cell phone which is inoperative for any other types of calls is still operative for 911 calls. This fact is acknowledged by the trial judge in her FOFCOL, thus that Jones's cell phone may have been inoperative is of no consequence since it still could have been used to place 911 calls. Secondly, law enforcement officials are hardly

22

unaccustomed to hearing suspects claim that he/she "did not do it." We determine from the totality of the record in this case, that the failure of law enforcement officials to follow-up on Jones's proclamations of innocence might, arguendo, rise to the level of negligence, but certainly these actions or inactions fall well short of conduct which could be described as reckless disregard.

¶27.    In sum, and for the sake of emphasis, these are the relevant facts of this case. The GPD[12] learned that the bomb threat calls to 911 were made from a Cellular South phone during certain time frames on the dates of August 15, 1999, and August 16, 1999; the GPD secured a circuit court order for the Telepak/Cellular South phone records in an effort to learn the identity of the owner of the cellular phone from which these 911 calls had been made; the chain of communication within the Telepak network went from Torrey to Whitehead to Mason to Whitehead to Torrey to Posecai, who in turn contacted the GPD, which promptly retrieved this 6-page Telepak packet generated by Mason; the second page of the 6-page packet contained information which, inter alia, identified Jones and his cell phone number; the two 911 dispatchers were interviewed; an arrest warrant for Jones was applied for and issued by a county court judge and Jones was arrested; a search warrant for Jones's house was applied for and issued by a justice court judge; pursuant to this search warrant, the GPD retrieved two cell phones, one of which contained the phone number as

[12]Since we have already named the GPD officers involved, we will not attempt to again specify what officer performed what act, but instead, we will simply refer to the police officers collectively as the GPD.

depicted on page two of the 6-page Telepak packet; the case was presented to the Washington County grand jury, which returned an indictment against Jones; the cellular phone records remained in the custody of the District Attorney's office for approximately five and one-half months (a fact found by the trial judge); a public defender was appointed to represent Jones, but later Marie Wilson was assigned as the public defender to represent Jones; and, Wilson was the first person to discover, after all of this time, that the cell phone numbers had been transposed and that the bomb threat calls had been made, not from the transposed number (Jones's cell phone), but instead from the untransposed cell phone number, which did not belong to Jones.

¶28.    A review of the record reveals, inter alia:  (1) that these cellular phone records had passed through the hands of at least four Telepak employees, various officers with the GPD, the District Attorney's office, the grand jury, and two public defenders, before the transposed cell phone numbers were discovered; (2) that the GPD interviewed the 911 dispatchers; (3) that at least one GPD officer listened to the 911 tapes at least twice; and, (4) that the GPD appeared before three different judges during the course of the investigation for (a) a subpoena duces tecum to retrieve the cell phone records, (b) an arrest warrant for Jones, and (c) a search warrant for Jones's home.  Despite the existence of these facts, the trial judge determined that the GPD was guilty of reckless disregard of the safety and well-being of John Jones by conducting an "inadequate" and "careless" investigation.  With the utmost respect for the very learned and experienced trial judge, we are constrained to find that her finding,

24

from the record before her, that the GPD officers' actions amounted to reckless disregard of the safety and well-being of John Jones is not supported by substantial, credible and reasonable evidence, and was thus manifestly wrong.

¶29. We again emphasize that the second page of the 6-page Telepak packet contains the transposed numbers resulting in the identification of Jones and his cell phone number. Again, as already noted, at the top of each of the remaining four pages, which set out the information on the bomb threat calls, is the following information:

RECCODE: F7          CLNGNMB: [untransposed no.]   CALLTYP: 1

For the next twenty-two lines/columns on each of these four pages, there appears really nothing more than computer language which is basically indiscernible. In fact, Lt. Suber testified that he was clueless as to what this computer language meant. From the record before us, we come to the inescapable conclusion that the GPD's failure to realize that the cell phone number appearing on pages 3-6 of the 6-page Telepak packet was different from the cell phone number appearing on page 2 amounts to, at most, negligence. It simply does not evidence reckless disregard within the meaning of the statute and our case law. As pointed out by the trial judge, reckless disregard under the MTCA, is action which amounts to "wanton and willful" conduct. Citing *Turner v. City of Ruleville*, 735 So.2d 226, 229-30 (Miss. 1999).

¶30. We have respectfully determined that the MTCA cases cited by Jones which involve vehicular accidents are of little benefit to the resolution of today's case. *See Miss. Dep't of*

25

*Public Safety v. Durn*, 861 So.2d 990 (Miss. 2003); *City of Jackson v. Brister*, 838 So.2d 274 (Miss. 2003); *City of Jackson v. Lipsey*, 834 So.2d 687 (Miss. 2003); *City of Jackson v. Perry*, 764 So.2d 373 (Miss. 2000); *Maye v. Pearl River County*, 758 So.2d 391 (Miss. 1999). Likewise, Jones cited as authority *Foster v. Noel*, 715 So.2d 174 (Miss. 1998). A close reading of *Foster* reveals it is unquestionably factually distinguishable from today's case. In *Foster*, Kirby, the manager of the local Jitney Jungle grocery store, was carrying a customer's groceries to the car, and while in the parking lot, Kirby noticed a man with two packages of rib-eye steaks under his shirt. Kirby confronted the shoplifter, who by that time had placed the steaks under the driver's seat of a truck, retrieved the steaks, and told the man to remain there until the police arrived. Kirby identified the man as a black male and confirmed that there was also a black male passenger in the truck. The men drove off, and Kirby wrote down the tag number. Once the police officers arrived, Kirby gave the officers the license plate information and also informed the officers that the truck was occupied by two black males. Kirby also identified one of the truck's occupants by name. Kirby later arrived at the police station where he met with Officer Luckett and gave Luckett the details of the shoplifting incident and the truck's tag number. From this information, Luckett was able to determine that the owner of the truck was a female named Jacqueline Noel. Even though Luckett, by that time, knew that the suspects were two males, he filled out the paperwork, including an affidavit for an arrest warrant, naming Jacqueline Noel, a female, as the person who had stolen the steaks. This Court found:

26

Yazoo City, via Officer Luckett acting within the scope of his employment with the Yazoo City Police Department, was well aware that the Jitney Jungle manager had not accused Noel of being the shoplifter. Despite this information being presented to Luckett, an affidavit stating that Noel shoplifted and a warrant for her arrest based upon the erroneous affidavit were processed and executed. Obviously, there was a flagrant disregard of the information provided by the store manager to Officer Luckett. This flagrant disregard led to Noel (a woman already suffering from depression and taking Prozac) being falsely arrested, detained at the police station for approximately an hour and a half, having criminal shoplifting charges brought against her and having her name and address published in a newspaper as being a shoplifter.

As the trial court noted in her findings and conclusions, the Yazoo City Police Department instigated the proceedings against Noel by failing to investigate her involvement in the shoplifting incident, although it was known she was not accused of being involved.

*Id.* at 183.

¶31. The actions of the Greenville Police Department in the case sub judice pale in comparison to the egregious actions of Officer Luckett in *Noel*. Unlike the police officer in *Noel*, the GPD officers methodically went through an investigative process where they, among other things, appeared before three different judges, obtained phone records, listened to the 911 tapes containing the bomb threats, and conducted interviews, all in an effort to get to the bottom of who had made these bomb threat calls to 911. Viewing the evidence in the light most favorable to the Joneses, the most they proved was that one or more of the GPD officers were negligent, thus causing the City of Greenville to be exempt from liability under the MTCA. *See* Miss. Code Ann. § 11-46-9(1)(c).

27

## CONCLUSION

¶32.    The record reveals immense suffering by John Jones and his wife and children due to Jones's arrest for a crime which he unquestionably did not commit.  If an injured plaintiff can prove liability in a court of law, the party proven to be at fault and legally liable should pay. In this case, someone did pay – Telepak.  The Greenville police officers were at the most, negligent – they did not act in reckless disregard of the safety and well-being of Jones or any other citizen.  Thus pursuant to the provisions of the MTCA, the City of Greenville is exempt from liability in this case.

¶33.    For these reasons, we are constrained as a matter of law to reverse the judgment as entered in favor of John Jones and Monica Jones, and render judgment here in favor of the City of Greenville.

¶34.    **REVERSED AND RENDERED.**

**SMITH, C.J., WALLER AND COBB, P.JJ., AND DICKINSON, J., CONCUR. EASLEY AND GRAVES, JJ., DISSENT WITHOUT SEPARATE WRITTEN OPINION. DIAZ AND RANDOLPH, JJ., NOT PARTICIPATING.**