# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-CA-01137-SCT

*CITY OF LAUREL, MISSISSIPPI*

*v.*

*CLYDE WILLIAMS, AS PERSONAL/LEGAL*
*GUARDIAN AND NEXT FRIEND OF MICHAEL*
*DEANTHONY WILLIAMS, INDIVIDUALLY AND*
*CLYDE WILLIAMS AS PERSONAL/LEGAL*
*GUARDIAN AND NEXT FRIEND OF MINOR*
*CHILD, MICHAEL DEANTHONY WILLIAMS*
*AND THE MINOR CHILD, DORRIEN*
*ALEXANDER WILLIAMS, BEING THE*
*WRONGFUL DEATH HEIRS OF LISA*
*WILLIAMS, DECEASED*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/23/2008 |
| TRIAL JUDGE: | HON. BILLY JOE LANDRUM |
| COURT FROM WHICH APPEALED: | CIRCUIT COURT OF THE SECOND JUDICIAL DISTRICT OF JONES COUNTY |
| ATTORNEYS FOR APPELLANT: | L. CLARK HICKS, JR. |
| | L. GRANT BENNETT |
| ATTORNEY FOR APPELLEES: | MARK KEVIN HORAN |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | REVERSED AND RENDERED - 11/19/2009 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, C.J., DICKINSON AND KITCHENS, JJ.**

**KITCHENS, JUSTICE, FOR THE COURT:**

¶1. Kenneth Wilson was convicted of the murder of his girlfriend, Lisa Williams. Prior to Williams's murder, officers of the City of Laurel Police Department were dispatched to two separate disturbances involving Wilson, but no arrest was made. Williams's wrongful-

death beneficiaries brought suit against the City of Laurel, alleging that the City was liable for failing to arrest Wilson. Following a bench trial, the circuit judge found for the plaintiffs and awarded damages of $75,000. The City of Laurel now appeals.

## FACTS

¶2. At approximately 8:30 p.m. on July 2, 2003, Officers Styron Keller and Shane Valentine of the Laurel Police Department were dispatched to an alleged domestic dispute at Lisa Williams's residence. Neither Officer Keller nor Officer Valentine noticed anything unusual about the appearance of Williams or Kenneth Wilson, and there was no indication that either of them had been "struck, hit or harmed in any way . . . ." After making these initial observations, the officers separated Williams and Wilson. Officer Keller interviewed Wilson, while Officer Valentine interviewed Williams.

¶3. Officer Keller testified that Wilson was calm and cooperative throughout the interview. During this interview, Officer Keller noticed a nick on one of Wilson's right fingers. When asked about the abrasion, Wilson explained that he did not know he had been cut, and that he likely had received it at work. However, Wilson admitted that he and Williams had gotten into a "tussle," and that Williams had hit him in the head.

¶4. Rika Carmichael, Williams's niece and roommate, testified that she had been in another room when Wilson and Williams began fighting. Carmichael "heard a lot of bumping" from the room, so she opened the door and found Wilson on top of Williams on the bed. Carmichael added that there were no signs of injury to Williams, other than "her hair [being] messed up." Carmichael then directed Williams's fourteen-year-old son to call the police, and within approximately ten minutes, the officers arrived at the scene.

2

¶5. After the field interviews had been performed, Officer Keller told Wilson and Williams that he had probable cause to arrest both of them. Officer Keller asked Williams and Wilson whether they wished to press charges against each other, and both indicated that they did not wish to do so. Both Williams and Carmichael indicated that they simply wanted Wilson to leave the residence.

¶6. Wilson informed Officer Keller that he intended to go to the home of Williams's mother, Annie Walker, where he occasionally went when he and Williams got into a fight. Officers Keller and Valentine watched Wilson pack a bag, with Williams's assistance, and the officers stayed at the scene until Wilson had left the residence on foot.

¶7. Carmichael testified that after the officers had left the scene, Wilson returned to the house and asked for a ride. Carmichael then drove Wilson to Walker's house. Carmichael said that she was in no fear of Wilson.

¶8. Later that night, at approximately 10:00 p.m., Officers Valentine and Keller and Sergeant Jackson responded to a second incident, this one at Annie Walker's residence. Upon arrival, the officers found Wilson sitting on the sidewalk steps leading to the house. Officer Keller testified that Wilson was "calm, cool [and] cooperative."

¶9. Walker and her husband informed Officer Valentine that they simply wanted Wilson to leave. Walker testified that Wilson was very intoxicated and angry, but Walker did not suggest that she feared Wilson. Furthermore, Walker suggested at trial that she had wanted Wilson arrested, but she indicated that she had wanted him arrested only for trespassing.

¶10. Officer Keller informed Wilson that he could choose between his mother's picking him up or going to jail. Ultimately, Officer Keller called Wilson's mother, who agreed to

3

pick up Wilson at the police department. It is disputed whether Wilson was under arrest at that time. Although Wilson was placed in handcuffs before being placed in the car, the officers testified that it is common practice to place any person riding in the back of a patrol car in handcuffs. In addition, Officer Keller gave the dispatcher the code "10-12," which indicates a passenger or visitor is in the car, rather than the code "10-15," which indicates that a prisoner is in the car and the car is en route to the jail.

¶11. Some time later, Wilson's mother and father picked up Wilson at the police station, but no evidence was presented at trial as to where Wilson's parents took him.

¶12. At approximately 11:15 p.m., the officers were called back to Carmichael's and Williams's house. At the scene, the officers found Wilson with a knife in his hand, standing over Williams, who was still alive but covered in blood. The officers arrested Wilson, and Williams died of stab wounds at the hospital.

¶13. On June 23, 2008, following a bench trial, the Circuit Court of the Second Judicial District of Jones County entered its final judgment, finding the City of Laurel liable for the death of Lisa Williams.

## ISSUE

¶14. The only issue on appeal is whether the City of Laurel is immune from liability under the facts of this case.

## STANDARD OF REVIEW

¶15. Immunity is a question of law. *Miss. Dep't of Pub. Safety v. Durn*, 861 So. 2d 990, 994 (Miss. 2003) (citing *Mitchell v. City of Greenville*, 846 So. 2d 1028, 1029 (Miss. 2003)). "This Court reviews errors of law de novo, including the proper application of the

4

Mississippi Tort Claims Act." ***Phillips v. Miss. Dep't of Pub. Safety***, 978 So. 2d 656, 660 (Miss. 2008). Notwithstanding, "[t]he findings of fact by a circuit court judge, sitting without a jury, will not be reversed on appeal where they are supported by substantial, credible, and reasonable evidence." ***Id.*** (citing ***City of Greenville v. Jones***, 925 So. 2d 106, 109 (Miss. 2006); ***City of Jackson v. Perry***, 764 So. 2d 373, 376 (Miss. 2000)).

## DISCUSSION

¶16. Through the Mississippi Tort Claims Act (MTCA), the Legislature has provided that, as a matter of public policy, the state and its political subdivisions are immune from tortious acts or omissions by its employees while they are acting within the course and scope of their employment. Miss. Code Ann. § 11-46-7(1) (Rev. 2002); ***Phillips***, 978 So. 2d at 660. However, the Legislature saw fit to carve out certain exceptions to the general rule of sovereign immunity. The applicable exception in this case provides that when a police officer acts within the scope of his or her employment, the city will not be held civilly liable unless the officer acted with reckless disregard of the safety and well-being of a person not engaged in criminal conduct. Miss. Code Ann. § 11-46-9(1)(c) (Rev. 2002).[1]

---

[1]Specifically, Mississippi Code Section 11-46-9(1)(c) states:

(1) A governmental entity and its employees acting within the course and scope of their employment or duties shall not be liable for any claim:
. . .

(c) arising out of any act or omission of an employee of a governmental entity engaged in the performance or execution of duties or activities relating to police or fire protection unless the employee acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of injury.

5

¶17. To recover damages in such a matter, a plaintiff must "prove by a preponderance of evidence that the defendants acted in reckless disregard of his [or her] safety and that [the plaintiff] was not engaged in criminal activity at the time of injury." *Phillips*, 978 So. 2d at 661 (citing *Simpson v. City of Pickens*, 761 So. 2d 855, 859 (Miss. 2000)). "Reckless disregard has been defined by this Court as a higher standard than gross negligence, and it embraces willful or wanton conduct which requires knowingly and intentionally doing a thing or wrongful act." *Phillips*, 978 So. 2d at 661. "Reckless disregard usually is accompanied by a conscious indifference to consequences, amounting almost to a willingness that harm should follow." *Durn*, 861 So. 2d at 995 (quoting *Maye v. Pearl River County*, 758 So. 2d 391, 394 (Miss. 1999)). Reckless disregard occurs when the "conduct involved evinced not only some appreciation of the unreasonable risk involved, but also a deliberate disregard of that risk and the high probability of harm involved. *Id.* (quoting *Maldonado v. Kelly*, 768 So. 2d 906, 910-11 (Miss. 2000)). In addition, "the nature of the officers' actions is judged on an objective standard with all the factors that they were confronted with." *Phillips*, 978 So. 2d at 661 (citing *City of Jackson v. Powell*, 917 So. 2d 59, 71 (Miss. 2005)).

¶18. The trial judge held that "the officers did act in reckless disregard for the safety and well-being of Lisa Williams when they failed to arrest Kenneth Wilson either at the home of Rika Carmichael or later at the home of Annie Walker." The judge went on to hold that "[b]y refusing to place Kenneth Wilson under arrest on either of these two occasions, the officers . . . displayed a conscious indifference to the consequences of their failure to make the arrest."

6

¶19. In a similar case, *Collins v. Tallahatchie County*, 876 So. 2d 284 (Miss. 2004), the failure to arrest a person suspected of domestic violence was not found to rise to the level of reckless disregard. In *Collins*, the plaintiff's estranged husband telephoned the plaintiff and threatened to kill her. *Id.* at 286. The plaintiff reported the threatening calls to the Tallahatchie County Sheriff's Department and sought her estranged husband's arrest. *Id.* The following day, at the suggestion of the sheriff's department, the plaintiff signed a criminal affidavit to effectuate an arrest warrant on her estranged husband for domestic violence. *Id.* The arrest warrant was signed by the judge but was never delivered to the sheriff's department. *Id.* Four days later, the plaintiff's estranged husband broke into the plaintiff's home and shot her twice before taking his own life. *Id.*

¶20. The plaintiff survived and sought damages from Tallahatchie County for the sheriff's department's failure to make a warrantless arrest under Mississippi Code Section 99-3-7(3) when there was probable cause to do so.[2] *Id.* at 287. This Court affirmed the trial judge's decision to extend immunity under Section 11-46-9(1)(c), noting that "reckless disregard is a higher standard than gross negligence and 'embraces willful or wanton conduct which requires knowingly and intentionally doing a thing or wrongful act.'" *Id.* at 287 (*citing Turner v. City of Ruleville*, 735 So. 2d 226, 230 (Miss. 1999)). The Court recognized that, although there was ample probable cause to make a warrantless arrest under Section 99-3-

---

[2] "Any law enforcement officer shall arrest a person with or without a warrant when he has probable cause to believe that the person has, within twenty-four (24) hours of such arrest, knowingly committed a misdemeanor which is an act of domestic violence . . . ." Miss. Code Ann. § 99-3-7(3) (Rev. 2007).

7(3), failure to arrest in such a situation does not inherently establish reckless disregard. *Id.* at 288.

¶21.    Here, much like the plaintiff in *Collins*, the plaintiffs assert that the officers acted with reckless disregard of the safety and well-being of Lisa Williams when they failed to arrest Wilson prior to her murder. However, they have failed to meet the burden placed upon them by Section 11-46-9(1)(c). Nothing in the record establishes that the officers' actions amounted to willful or wanton conduct. There is no evidence that the officers intended for harm to follow their decision not to arrest, nor is there evidence establishing a conscious indifference to the consequences of their actions.

¶22.    The officers went to Williams's house following the 911 call and interviewed all of the parties present. Nothing in the record indicates that, during the interviews, either Wilson or Williams expressed a desire to press charges against the other, or that Williams was in fear of Wilson. Furthermore, although the trial judge found adequate probable cause, failure to arrest where probable cause is present does not inherently support a finding of reckless disregard. *See, e.g.*, *Collins*, 876 So. 2d at 287-88. The decision not to arrest despite probable cause must "embrace willful or wanton conduct." *Phillips*, 978 So. 2d at 661. The officers adequately investigated both incidents, weighed the evidence before them, and made informed decisions regarding the appropriate measures to take. To hold that the officers understood Wilson to constitute an "unreasonable risk" to Williams, and that they "deliberately disregarded that risk and the high probability of harm involved" would be inconsistent with our established precedent. *Durn*, 861 So. 2d at 995.

8

¶23. Because the officers did not act with reckless disregard for the safety and well-being of Lisa Williams, other avenues of immunity asserted by the defendant need not be addressed.[3]  Additionally, the argument as to whether the officers' actions were the proximate cause of the death of Williams need not be discussed.

## CONCLUSION

¶24. The officers of the City of Laurel did not act with reckless disregard for the safety and well-being of Lisa Williams; thus immunity under Mississippi Code Section 11-46-9(1)(c) is proper.  The decision of the Circuit Court of the Second Judicial District of Jones County is reversed and rendered.

¶25. **REVERSED AND RENDERED**.

**WALLER, C.J., CARLSON, P.J., DICKINSON, RANDOLPH, LAMAR AND PIERCE, JJ., CONCUR.  WALLER, C.J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY CARLSON, P.J., RANDOLPH, LAMAR AND PIERCE, JJ.  GRAVES, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY CHANDLER, J.**

**WALLER, CHIEF JUSTICE, SPECIALLY CONCURRING:**

¶26. I concur in the majority decision in full.  However, I write separately to discuss further the standards of review and standards of conduct discussed by the majority and dissenting opinions and to explain the bearing those standards have on our ultimate decision to reverse the trial court's conclusion.

---

[3] The City asserts that, aside from the immunity granted under Section 11-46-9(1)(c), immunity is proper under Section 99-3-7(7) which states in full: "A law enforcement officer shall not be held liable in any civil action for an arrest based on probable cause and in good faith pursuant to subsection (3) of this section, or failure, in good faith, to make an arrest pursuant to subsection (3) of this section." Miss. Code Ann. § 99-3-7(7) (Rev. 2007).

¶27. The majority opinion correctly states that the application of the Mississippi Tort Claims Act ("MTCA") and the immunity it confers upon political subdivisions of this state is a question of law subject to *de novo* review by this Court. *See* Maj. Op. at ¶15. However, in this case, no dispute exists as to the applicability of the MTCA. The City of Laurel is a political subdivision of the State, the officers are employees thereof, and their challenged actions were performed in the course of their employment. Thus, the question before us is not whether the MTCA applies to immunize the City of Laurel from liability for the officers' actions, but whether the "reckless disregard" *exception* to that immunity can be invoked based on the officers' actions.

¶28. Concurrently, our review of the circuit court judge's findings regarding the application of the "reckless disregard" exception is limited. The findings of a circuit court judge, sitting without a jury, "are safe on appeal where they are supported by substantial, credible, and reasonable evidence[,]" and "[t]his Court will not disturb those findings unless they are manifestly wrong, clearly erroneous or an erroneous legal standard was applied." ***City of Jackson v. Perry***, 764 So. 2d 373, 376 (Miss. 2000) (citing ***Bell v. City of Bay St. Louis***, 467 So. 2d 657, 661 (Miss. 1985)).

¶29. Here, the City of Laurel is immune from suit for the officers' failure to arrest Wilson and/or Williams unless the plaintiffs can prove that the officers acted in "reckless disregard" of Williams's safety and well-being. The question of whether Officers Keller and Valentine acted in "reckless disregard" for Williams's safety and well-being can be characterized as a question regarding the application of the law to the facts. In other words, the trial judge

10

was required to apply the law (*i.e.*, our definition of "reckless disregard") to his findings of fact to determine if Officer Keller's and Officer Valentine's actions rose to that level.

¶30.	The circuit court judge made several findings of fact. First, the judge found that the officers had probable cause to arrest Wilson and/or Williams at the time of the first incident and to arrest Wilson at the time of the second incident. These findings clearly are supported by substantial and credible evidence which is contained in the record on appeal before us. Williams, Wilson, and other witnesses at the scene of the first incident related to officers their accounts of the physical struggles between Williams and Wilson. Thus, the circuit court judge's findings that the officers had probable cause to arrest Williams, Wilson, or both of them are not manifestly wrong or clearly erroneous.

¶31.	The circuit court judge's final finding, however, is not supported by the evidence. The judge found that, by failing to arrest Wilson, the officers "displayed a conscious indifference to the consequences of their failure to make the arrest." Hence, when the judge applied our definition of "reckless disregard" to these facts, he arrived at a conclusion of law that the officers had acted in reckless disregard for Williams's safety and well-being when they failed to arrest Wilson.

¶32.	We have held today that this conclusion was in error. As the majority correctly states, "[n]othing in the record establishes that the officers' actions amounted to willful or wanton conduct [because] [t]here is no evidence that the officers intended for harm to follow their decision not to arrest, nor is there evidence establishing a conscious indifference to the consequences of their actions." *See* Maj. Op. at ¶21. In other words, the circuit judge's final finding of fact – that the officers "displayed a conscious indifference to the consequences of

11

their failure to make the arrest" – was manifestly wrong and/or clearly erroneous.[4] As such, the circuit court's conclusion of law that the officers acted in reckless disregard of Williams's safety was also in error.

¶33. This holding, however, should not be read as a tacit approval of Officer Keller's and Officer Valentine's handling of the situation. Presiding Justice Graves's dissent accurately points to Mississippi Code Section 99-3-7, providing law enforcement officers with a statutory duty to arrest a person who the officer has probable cause to believe has committed an act of domestic violence. Miss. Code Ann. § 99-3-7(3)(a) (Rev. 2007).[5] And in cases where the officers have probable cause to believe that multiple parties have committed such acts of violence, the officers are required to determine which party is the "principal aggressor" and to arrest that person. Miss. Code Ann. § 99-3-7(3)(b) - (d) (Rev. 2007).

¶34. Nonetheless, "reckless disregard" is more than negligence but less than an intentional act. ***Miss. Dep't of Pub. Safety v. Durn***, 861 So. 2d 990 (Miss. 2003). Thus, a simple failure

---

[4] The circuit court applied the correct legal standard, however, citing ***Durn*** for the "reckless disregard" definition.

[5] As the majority notes, however, law enforcement officers are not liable for failing to make an arrest under Section 99-3-7(3) if the failure to do so was in "good faith." Miss. Code Ann. § 99-3-7(7) (Rev. 2007). Black's Law Dictionary defines "good faith," in pertinent part, as "honesty in belief or purpose," or "faithfulness to one's duty or obligation." Black's Law Dictionary 555 (abr. 7th ed. 2000). It is unlikely that Officer Keller's and Officer Valentine's actions meet this standard. During the first incident, the officers correctly informed both Wilson and Williams that they had the authority to take both of them to jail. In other words, the officers had probable cause to believe that Williams and Wilson both had committed domestic violence. The officers thus had a duty to arrest one or both of them pursuant to Section 99-3-7. Accordingly, at the time of the first incident, both officers held an "honest belief" that they could arrest Wilson, but they were not "faithful to their duty or obligation" to do so. Thus, the officers' failure to arrest Wilson and/or Williams at the scene of the first incident was not a "failure, in good faith," as Section 99-3-7(7) requires, so the "good faith" exception would not apply to protect them individually from liability.

12

to make an arrest does not necessarily constitute "reckless disregard." We held as much in *Collins v. Tallahatchie County*, 876 So. 2d 284 (Miss. 2004). In that case, we noted that there was ample probable cause to make an arrest under Section 99-3-7(3), but we recognized that failure to arrest when there is probable cause to do so, even if the failure is negligent, does not inherently establish "reckless disregard." *Id.* at 288; *see also Phillips v. Miss. Dep't of Pub. Safety*, 978 So. 2d 656, 661 (Miss. 2008) (holding that "reckless disregard" is a higher standard even than gross negligence).

¶35. Here, the officers' actions arguably "rise to the level of negligence, but certainly [their] actions or inactions fall . . . short of conduct which could be described as reckless disregard." *City of Greenville v. Jones*, 925 So. 2d 106, 119 (Miss. 2006). A review of the audio/video recording of the incidents reveals that Officers Keller and Valentine were confronted with a difficult situation. They had probable cause to believe that both Wilson and Williams had committed acts of domestic violence. The officers thus were required to make an arrest under Section 99-3-7(3). However, their failure to do so, even if negligent or grossly negligent, does not in and of itself meet the "reckless disregard" standard.

¶36. For the plaintiffs, "reckless disregard" requires a higher burden of proof. Pursuant to Mississippi Code Section 11-46-9(1)(c) and our precedent construing the term "reckless disregard," the plaintiffs were required to show by a preponderance of the evidence that Officers Keller and Valentine appreciated an unreasonable risk to Williams's safety and an attendant high probability of harm to her, but that, by failing to arrest Wilson, the officers deliberately disregarded that risk in a willful and wanton manner, evincing a conscious indifference to the consequences amounting almost to a willingness that the harm should

13

follow. Miss. Code Ann. § 11-46-9(1)(c) (Rev. 2002). *Phillips*, 978 So. 2d at 661; *Durn*, 861 So. 2d at 995.

¶37. The plaintiffs simply have not met this burden. Therefore, the trial court's conclusion that the officers acted in reckless disregard for Williams's safety and well-being was clearly in error, and the immunity provided by the MTCA protects the City of Laurel from suit.

**CARLSON, P.J., RANDOLPH, LAMAR AND PIERCE, JJ., JOIN THIS OPINION.**

**GRAVES, PRESIDING JUSTICE, DISSENTING:**

¶38. This case involves three Emergency 911 calls for assistance over the course of little more than two hours on the night of July 2, 2003, by the family of Lisa Williams to the Laurel Police Department and two failures by officers of that department to follow and enforce the applicable laws. These failures occurred after an admission by the involved officers that there was a high probability of harm if no action was taken. These failures led to the tragic murder of Williams in front of her two children and her niece. Based on the record before us, I cannot agree with the majority of this Court that the officers of the City of Laurel did not act with reckless disregard of the safety and well-being of Williams. Because I would affirm the decision of the trial court finding the City of Laurel liable for Williams' death, I respectfully dissent.

¶39. As stated by the majority, immunity is a question of law, and this Court reviews errors of law de novo. *Phillips v. Miss. Dep't of Pub. Safety*, 978 So. 2d 656, 660 (Miss. 2008). Further, "[t]he findings of fact by a circuit court judge, sitting without a jury, will not be reversed on appeal where they are supported by substantial, credible, and reasonable

14

evidence." ***Phillips v. Miss. Dep't of Pub. Safety***, 978 So. 2d 656, 660 (Miss. 2008). This Court also has stated the well-settled standard of review of a judgment from a bench trial as follows: "'A circuit court judge sitting without a jury is accorded the same deference with regard to his findings as a chancellor,' and his findings are safe on appeal where they are supported by substantial, credible, and reasonable evidence.'" ***City of Jackson v. Perry***, 764 So. 2d 373, 376 (Miss. 2000).

¶40.    The applicable immunity exception under the Mississippi Tort Claims Act (MTCA) provides that a governmental entity may be held liable where an "employee acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of injury." Miss. Code Ann. § 11-46-9(1)(c) (Rev. 2002). "A review of our case law illustrates that we find reckless disregard when the 'conduct involved evinced not only some appreciation of the unreasonable risk involved, but also a deliberate disregard of that risk and the high probability of harm involved.'" ***Miss. Dep't of Pub. Safety v. Durn***, 861 So. 2d 990, 995 (Miss. 2003) (quoting ***Maldonado v. Kelly***, 768 So. 2d 906, 910-11 (Miss. 2000)).

¶41.    Mississippi Code Section 99-3-7(3) provides that: "Any law enforcement officer *shall* arrest a person with or without a warrant when he has probable cause to believe that the person has, within twenty-four (24) hours of such arrest, knowingly committed a misdemeanor which is an act of domestic violence . . . ." Miss. Code Ann. § 99-3-7(3)(a) (Rev. 2007) (emphasis added). That section also says that:

> (b) If a law enforcement officer has probable cause to believe that two (2) or more persons committed a misdemeanor which is an act of domestic violence as defined herein, or if two (2) or more persons make complaints to the officer, the officer shall attempt to determine who was the principal aggressor. The term principal aggressor is defined as the most significant,

15

rather than the first, aggressor. The officer shall presume that arrest is not the appropriate response for the person or persons who were not the principal aggressor. If the officer believes that all parties are equally responsible, the officer shall exercise such officer's best judgment in determining probable cause.

(c) To determine who is the principal aggressor, the officer shall consider the following factors, although such consideration is not limited to these factors:

(i) Evidence from the persons involved in the domestic abuse;

(ii) The history of domestic abuse between the parties, the likelihood of future injury to each person and the intent of the law to protect victims of domestic violence from continuing abuse;

(iii) Whether one (1) of the persons acted in self-defense; and

(iv) Evidence from witnesses of the domestic violence.

(d) A law enforcement officer shall not base the decision of whether to arrest on the consent or request of the victim.

Miss. Code Ann. § 99-3-7(3)(b)(c)(d) (Rev. 2007).

¶42. The trial court found that the City of Laurel Police Department officers acted in reckless disregard. Specifically, the trial court found:

After hearing testimony in the case, this Court believes that Officers Keller and Valentine had probable cause to arrest Kenneth Wilson and/or Lisa Williams at the first call to Rica Carmichael's home on July 2, 2003. Further, the Court finds that the officers also had probable cause to arrest Kenneth Wilson at the residence of Annie Walker on the same day. In fact, Ms. Walker testified that when the officers left her residence with Kenneth Wilson, he was handcuffed and in the back of the police car. Therefore, she believed he was under arrest. After two incidents involving the same individual had occurred so closely in time on the same date, the Court finds that the officers did act in reckless disregard for the safety and well-being of Lisa Williams when they failed to arrest Kenneth Wilson either at the home of Rica Carmichael or later at the home of Annie Walker.

Opinion and Order of the Court (June 3, 2008). The trial court further said:

"Reckless disregard," as defined by the Mississippi Supreme Court, is more than negligence but less than an intentional act; it is usually accompanied by a conscious indifference to consequences, amounting almost to a willingness that harm should follow. [*Durn*], 861 So. 2d 990 (Miss. 2003). By refusing to place Kenneth Wilson under arrest on either of these two

16

occasions, the officers, in the Court's opinion, displayed a conscious indifference to the consequences of their failure to make the arrest.

Opinion and Order of the Court (June 3, 2008). The trial court then awarded the plaintiff $75,000, which was the amount of damages stipulated to by the parties. The findings of the trial court are supported by substantial, credible and reasonable evidence. Nevertheless, the majority of this Court now departs from that standard and reverses and renders that decision.

¶43. The majority cites *Collins v. Tallahatchie County*, 876 So. 2d 284 (Miss. 2004) as support for the finding that the City of Laurel officers did not act with reckless disregard of the safety and well-being of Lisa Williams. However, *Collins* offers no such support. In *Collins*, this Court found ample probable cause to arrest the defendant but found that the Tallahatchie County Sheriff's Department (TCSD) did not act in reckless disregard because there was no evidence that the TCSD knew that it could arrest the defendant. Specifically, this Court said:

> Even viewing the facts in a light most favorable to Essie, she has shown no evidence that TCSD knew that it could and/or was required to arrest Robert. TCSD's conduct, even if negligent, can not [sic] be said to have risen to the level of reckless disregard based upon the facts in this record. Therefore, § 11-46-9(c) did provide immunity based upon TCSD's conduct, and summary judgment was proper as to TCSD.

*Id*. at 288. As discussed below, the Laurel officers clearly knew that they could and/or were required to arrest Kenneth Wilson. Also, the acts complained of in *Collins* happened over a several-day period, with the phone calls occurring on August 31, 2000, and the shooting occurring on September 4, 2000. This further establishes that *Collins* is factually dissimilar from the instant case, where the events occurred over the course of less than three hours. Also, it was unclear whether there was ever any physical altercation in *Collins* before the

17

shooting, a situation completely different from the situation here which involved a drunken altercation that produced bloodshed. Additionally, in *Collins*, this Court was reviewing summary judgment -- an entirely different procedural outcome than the instant case, with a judgment after a bench trial.

¶44. In the case at hand, the record contains a digital video disc (DVD) of the police audio and video recordings made during the first two incidents involving Kenneth Wilson and Lisa Williams. That DVD and other portions of the record offer evidence contradictory to testimony offered by officers at trial and to the facts relied upon by the majority and the specially concurring opinions. The record clearly establishes that the findings of the trial court were supported by substantial, credible and reasonable evidence. To establish this, I find it necessary to restate the facts contained in the record.

*Incident One - 911 Call Received at 8:26 p.m.*

¶45. As stated previously, there were three separate calls to police on the night of July 2, 2003, beginning at approximately 8:30 p.m. The first of the three calls for assistance was made by Williams' fourteen-year-old son, Michael. The call was necessitated by a fight between Wilson and Williams at the home of Williams' niece, Rika Carmichael, where the family had moved one or two days earlier. Carmichael testified that she heard bumping and fighting noises and opened the door to see Wilson on top of Williams. Carmichael, who testified that Williams' hair was messed up, instructed Michael to go call the police.

¶46. The majority refers to this first incident as an "alleged domestic dispute" and states that officers noticed nothing unusual about the appearance of Williams or Wilson, and that "there was no indication that either of them had been 'struck, hit or harmed in any way . . .

18

." This characterization is incorrect and unsupported by the record. The recording of the first incident reflects that immediately upon arrival on the scene, officers were greeted by voices that were at times loud and agitated, were informed that the parties were intoxicated and had been involved in an altercation, and observed that blood was visible on both parties.[6] This blood was discussed numerous times throughout the record. There are differing accounts of the blood. Officer Keller testified that he saw blood on Wilson's arm. Later, Keller testified as follows:

> When I observed him when I pulled them and separated them and brought him outside, he was there talking with me with hand gestures. And I looked at his right hand on his knuckle, and it looked like there was a slight aversion [sic] there. It didn't look like there was a cut. It looked like, you know, if you bump your knuckle you skin the skin back type deal. And I asked him what happened to his hand. And he said he really didn't know, he thought maybe he had done it at work because he had took the band-aid of [sic] it. I said, well, there's a little blood right there on your arm. He said, it may be coming from that. He said, I didn't even notice it. But the time I got there, if that would have been a fresh cut it would have been still bleeding or fresh blood, but the blood on his arm looked like it had been there a while. It was really dried to the skin.

¶47. Wilson cannot be heard to make any statement about receiving the cut at work on the recording. Keller testified that Wilson must have made the statement during one of the inaudible portions of the recording of the first incident. However, this statement is not supported by the record. On the recording, when asked about the blood on his arm, Wilson responded, "that's where she grabbed me. She grabbed me and hit me in the head." Toward the end of the call, the officer asked Wilson how bad his hand was cut and then appears to ask Wilson whether he's going to get it sewn up. Wilson then responded that he did not

---

[6]The only mention of blood being on Williams at that time comes from the recording.

know it was cut. When asked if it happened with the knife, Wilson responded that it might have. The recording of the second incident further disputes Keller's testimonial account of the blood and will be discussed later herein.

¶48. Officers also observed and secured a knife. Keller testified that it was only standard procedure and that the knife was returned. During the course of this call, Michael can be heard telling officers he saw the parties with their hands on each other but that he didn't see any blood. Officers separated Wilson from the group and Keller took him outside to question him while Valentine stayed inside with Williams, Carmichael, and the children. Carmichael testified that both she and Williams told Valentine that the parties had been fighting. The word "tussling" was also used at one point to describe the fighting. Valentine testified that he never interviewed any of the witnesses separately.

¶49. Upon getting Wilson outside, Keller recognized and remembered Wilson from a prior domestic call involving the same parties when they had lived at a different location. Wilson admitted the incident and said it had occurred on 8th Avenue and that Williams had called the police to have Wilson removed from the home. Keller could then be heard telling Wilson the following: "Well, I'm gonna tell you like this, right now I got enough to take you both to jail for domestic violence because you're bleeding . . . ." Keller then proceeded to point out that both parties had been drinking and could not drive, but that Wilson needed to find some place to go. Keller also told Williams that he had enough to put them both in jail for domestic assault, but was giving them a break unless police were called back out there that night, in which case they were both going to jail. Keller also could be heard telling Williams that he had told Wilson he needed to leave and that she had put him out before when she had

lived on 8th Avenue -- that he had come over there on this before. Keller then told Williams that the parties needed to separate because somebody was going to end up "getting hurt." Keller verified this statement again during his testimony at trial. On the recording, Keller also told Williams that he had enough probable cause to arrest both parties, but that he was going to let it slide this time. Keller also said, "[t]he first one's on me and the next one's gonna be on you."

¶50. While officers were waiting for Wilson to leave, Wilson apparently inquired as to whether the officers were going to give him a ride, to which an officer responded, "we can't ride you" and told him it was not a taxi. An officer can also be heard saying, "Man, did we not just sit there and tell you I'm cutting you a break right now?" Then shortly afterward, an officer told Wilson to do himself a favor, get his stuff and take advantage of their generosity. After gathering his belongings, Wilson then apparently walked off down the street and the officers left.

***Incident Two - 911 Call Received at 10 p.m.***

¶51. Carmichael testified that, minutes after the officers left her house, Wilson walked back up, knocked on the door and asked Carmichael to drive him to the home of Williams' mother, Annie Walker. Carmichael drove Wilson to Walker's house and dropped him off. Shortly thereafter, Walker placed a call to the Laurel Police Department for assistance. Walker testified that Wilson was very intoxicated and angry. Walker testified that Wilson was "talking dirty and cussing" and refused to leave her porch, but then moved to the yard after she went next door to call the police. Wilson was on the sidewalk in front of Walker's home when Valentine and Keller (and at least one other officer) arrived separately on the scene.

21

Walker testified that officers spoke to Wilson, placed him in handcuffs and put him in the back of the patrol car. She testified that Valentine told her Wilson was going to jail and that they would not have to worry about him any more that night. Walker and Carmichael both testified that Walker then went to Carmichael's house to tell Williams that Wilson had been taken to jail and that she didn't have to worry any more that night.

¶52. The testimony of the officers differs from Walker's account. Keller testified that Wilson was "calm, cool, cooperative. He did not make any threatening gestures or say he was going to do anything to anybody. I mean, he was just as calm as he could be. It was yes, sir, no, sir." Both officers testified that Wilson was never under arrest and that they were merely giving him a ride, despite the fact that one of them told him during the first incident, "we can't ride you" and that they weren't a taxi. Keller testified that he called in to the station to let them know that he had a visitor on board and that he drove Wilson to the station so he could wait for his mother to pick him up. Valentine testified that he would say Wilson was not intoxicated.

¶53. The recording of the second incident reflects that Wilson was agitated because he did not have a place to stay. Wilson made a statement indicating that either he and Williams could both go to jail or he and Williams could both go to Carmichael's. Wilson said he went to Walker's because it was not right that he did not have a place to stay because Williams had cut him with a knife and he got "put out." Keller then responded that Williams did not cut Wilson with the knife and that Wilson said she did not cut him. Keller said he did not think Williams cut Wilson, but that her fingernail got him. This disputes Keller's testimony discussed previously pursuant to the first incident, where Wilson said he had received the cut

22

at work. Wilson said he did not know whether Williams had cut him or her fingernail had gotten him because he was drunk. Keller asked Wilson if he wanted to go to jail, to which Wilson replied he did not but that he did not have anywhere else to go. The officers repeatedly told Wilson that the Salvation Army was not going to take him because he was drunk. Wilson repeatedly admitted that he was drunk. One officer remarked that he'd never seen anybody who would rather go to jail. Wilson was placed in handcuffs, and one officer said he had to do what he had to do because Wilson could not stay on the street drunk. Then it was decided that Keller would call Wilson's mother to see if she would get him rather than him going to jail. Keller told Wilson's mother that Wilson would be put in jail if she did not come get him and she agreed to pick him up at the station. Keller took Wilson to the station and left him in the lobby to wait for his mother, who apparently picked him up a short while later and dropped him off at or near Carmichael's house.

***Incident Three - 911 Call Received at 11:10 p.m.***

¶54. Carmichael's statement to police indicates that Wilson returned to the house and knocked on Williams' bedroom window. Williams and Carmichael ignored Wilson's knocking, and he then went to a side door, broke the glass and broke into the house. Wilson attacked Williams, punching her in the face and punching the children and Carmichael as they attempted to intervene. Wilson then grabbed a large knife and began stabbing Williams. Wilson also cut Michael when he tried to help his mother. Carmichael then ran to a neighbor's house to call the police.

¶55. Just after 11 p.m., officers responded to the third and final call to Carmichael's house. Police reports indicate that officers arrived to find Wilson covered in blood, holding a knife

23

and standing over Williams, who had been stabbed repeatedly, but was still alive. According to the police report, Williams' children were crying and yelling, with one of them screaming, "Shoot him. Shoot him. He done killed my Mama." The other child was pleading, "don't let my momma die, don't let my momma die." Wilson held the knife to his own throat as officers attempted to negotiate with him to drop the knife. During this time, Williams somehow rolled down the stairs. Wilson apparently began pretending to stab himself in the neck, and officers subdued him and took him into custody. Carmichael and the children were taken to the police station to give statements. Williams was taken away by ambulance and died from her injuries.

***Summary and Conclusion***

¶56. Both Keller and Valentine testified at trial that they had no probable cause to arrest Wilson. Keller testified that he had been merely bluffing Wilson with threats of arrest. However, these statements are not supported by other substantial evidence contained in the record. Officers repeatedly told both Wilson and Williams that they had probable cause to make an arrest and specifically set out what established the probable cause. Officers repeatedly indicated that they were choosing not to make an arrest because they were giving Wilson a break.

¶57. The testimony of both officers demonstrated that they clearly knew and understood the applicable domestic violence laws and the police department policy which mandated an arrest. Officers had a duty to make an arrest. There is an argument that because officers were presented with conflicting evidence, they first had a duty to determine who was the principal aggressor. To determine the principal aggressor, as set out previously herein,

24

officers must consider evidence from the persons involved, the history of abuse between the parties, the likelihood of future injury, the intent of the law to protect victims, whether one person acted in self-defense, and evidence from witnesses. Evidence from the persons involved is only one of the factors that "shall" be considered in determining the principal aggressor. Miss. Code Ann. § 99-3-7(c) (Rev. 2007). All of the factors must be considered. Officers clearly failed to do that. Wilson said Williams hit him in the head, then later said that she cut him, but ultimately admitted there was a tussle and that he was too drunk to know how he got cut. Keller acknowledged that he didn't believe Wilson's later claim that Williams cut him and said her fingernail got him. Michael said he saw them touch each other. Carmichael heard fighting and saw Wilson on top of Williams. Carmichael also heard Williams telling Wilson to get off of her. Based on this evidence, any possible injury to Wilson likely occurred while Wilson was assaulting Williams or in Williams defense of herself. There is evidence that Wilson made a threat about both parties just going to jail if they both did not get to stay at Carmichael's house and that he was upset about getting "put out." He proceeded immediately to violate police orders by going to cause a related domestic disturbance across town at Walker's house. There is also evidence of a prior incident involving these same parties, when Williams called the police for assistance with a domestic dispute with Wilson. Keller recognized Wilson from the prior incident and even remembered Wilson's tattoo. Based on all of the applicable factors, one reasonably could conclude that Wilson was the principal aggressor. Further, the record indicates that officers likely had already made this determination, as they repeatedly had told Wilson they were giving him a break, they quickly disputed his later version of her cutting him, and they initiated the

25

process of arresting him during the second call. There is absolutely nothing on the DVD to indicate that Williams was ever aggressive or antagonistic toward the police or Wilson. The only recordings of Williams on the DVD are for brief moments during the group discussions in the first call. Officers never even interviewed her separately, and both Valentine and Carmichael testified to that fact. Williams answered every question asked by the officers on the recording and was completely cooperative, going so far as to get a bag for Wilson to carry his belongings. Moreover, Keller testified that Williams was calm and cooperative.

¶58. The majority notes that nothing in the record indicates that either Wilson or Williams expressed a desire to press charges. That is irrelevant. The law is designed to protect victims, and the decision to arrest "shall not" be based on the consent or request of the victim. Miss. Code Ann. § 99-3-7(d) (Rev. 2007). The record in this matter contains substantial evidence to determine that Wilson was the principal aggressor and to establish probable cause for arrest. Notwithstanding evidence that Wilson was the principal aggressor, the appropriate resolution in a situation where officers are unable to determine the principal aggressor is to arrest both parties, not to ignore probable cause and arrest neither party. Miss. Code Ann. § 99-3-7(b) (Rev. 2007).

¶59. The specially concurring opinion seemingly attempts to bolster the majority's finding that the failure of the officers to make an arrest does not constitute reckless disregard, based upon the unsupported finding that there was no appreciation of risk or harm. Such a finding is contradictory to the record in this matter. During the first incident, the officers told the parties that they needed to separate because somebody was going to end up "getting hurt." Clearly the officers appreciated the unreasonable risk and high probability of harm involved.

26

Yet the officers then deliberately failed to arrest Wilson not once, but twice. And the officers were completely correct; someone did end up "getting hurt." Lisa Williams was murdered. As stated previously, "we find reckless disregard when the 'conduct involved evinced not only some appreciation of the unreasonable risk involved, but also a deliberate disregard of that risk and the high probability of harm involved.'" *Durn*, 861 So. 2d at 995. That standard has been more than met here.

¶60.    The findings of the trial court are supported by substantial, credible, and reasonable evidence. Therefore, I would affirm the decision of the trial court finding the City of Laurel liable for Williams' death, and I respectfully dissent.

**CHANDLER, J., JOINS THIS OPINION.**